**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**George KILLIAN, George Rowell and**
**Charles Mathewson,**
**Defendants-Appellants.**

**No. 75–1437.**

United States Court of Appeals,
Fifth Circuit.

Dec. 29, 1975.

Allen C. D. Scott, II, Jacksonville, Fla. (Court-appointed), for Killian.

Henry Lee Adams, Jr., Jacksonville, Fla., for Rowell.

H. Randolph Fallin, Jacksonville, Fla. (Court-appointed), for Mathewson.

John L. Briggs, U. S. Atty., Charles B. Lembcke, Asst. U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before TUTTLE, THORNBERRY and CLARK, Circuit Judges.

TUTTLE, Circuit Judge:

These three defendants appeal from convictions following jury verdicts for violating the Federal Controlled Substances Act. Killian and Mathewson were convicted of conspiracy to distribute 81.6 grams of Phencyclidine Hydrochloride (PCP) in violation of 18 U.S.C. § 2, 21 U.S.C. § 841(a)(1), 846. Defendant Rowell was indicted only on the conspiracy count and was convicted on that count.

On July 6, 1974, in Jacksonville Beach, Florida, Agent Driver of the Drug Enforcement Administration met Richard Turner, Fontain Fitch and appellant Charles Mathewson to set up a purchase of PCP; Driver purchased one ounce for $1,650. On July 15, Driver called Turner to attempt to purchase eight ounces; Turner was amenable to the sale but said that at that time he had only two ounces so he would have to purchase more; during the conversation, Turner disclosed that the drugs came from an individual in the Detroit area. On July 22, Driver called Turner again and ar-

ranged to buy two ounces that afternoon at Turner's home; when Driver arrived several other individuals were in Turner's apartment, including defendants Killian and Mathewson.

Turner and Driver agreed on $2,500 for the two ounces; before Driver left to get the money, Killian approached him and asked if he was still interested in purchasing eight more ounces and Driver said he did want more drugs. Killian then stated that the additional drugs were in Detroit but he would guarantee delivery the next morning. Immediately after this conversation, Turner, Mathewson and Killian were arrested. After this arrest, a phone call came to Turner's apartment from an individual who identified himself as George (allegedly Rowell) and who was trying to locate Charlie (allegedly Mathewson); the agents took the call and told George that Charlie was unavailable and volunteered to take a message. George said he needed to talk to Charlie before 9 p.m. to see if Charlie wanted him on the plane. George made three more calls that evening trying to locate Charlie; in the last he told Agent Starrart without, of course, knowing his identity, that he would be arriving in Jacksonville on Delta Flight 881 at 1:36 a.m. Several agents met Rowell, evidently recognizing him by his resemblance to the other arrestees, and engaged him in conversation without identifying themselves; Rowell thought Charles had sent them. Rowell told the agents that he had left Detroit with 50 hits of PCP but that he had given it to a French girl whom he met on the plane.[1]

1. The testimony follows:
 "Q. Now, when you went to the airport were you going out there as identifiable D.E.A. agents?
 A. We went out there in an undercover capacity, to try to meet George, and talk with him.
 Q. After going to the airport, did you happen to identify this individual named George?
 A. Yes. When the flight departed when the passengers departed the plane, myself, Agent Driver and Agent Attaway ob-

served Mr. Rowell walking down the corridor by himself.
 We approached him. And he stated that he was George.
 Q. Well, now was there any special reason why you picked out this individual as being George?
 A. Well, he was about the freakiest of all.
 MR. ADAMS:
 Your Honor, I object to that. That is irrelevant and prejudicial.
 THE COURT:
 I will let him answer.

The first contention is made on behalf of all of the appellants. It is that the court erred in permitting testimony regarding the activities and the statements made by George Rowell after the arrest of the co-defendants, Killian and Mathewson, in evidence. Rowell raises the issue because he contends that without the admission of this testimony there is nothing to connect him with the conspiracy which terminated just before his telephone call which was intercepted by the agent. Killian and Mathewson raise it because they contend that Rowell's statement to the agent was hearsay as to them, which, of course, it was, and that they were prejudiced in the defense of their case by reason of this testimony.

The inquiry into the sufficiency of the evidence is two-fold. The first question is whether a conspiracy was proven within the intendment of the indictment. If this question is answered in the affirmative, the next question is: "Against which of the defendants was there adequate proof that he was a party to the conspiracy?" The separation of these issues is particularly necessary here because one of the defendants, the appellant Rowell, claims that there is not even the "slight" evidence (see *United States v. Sanchez*, 508 F.2d 388 (5th Cir. 1975)), which is required to implicate him in a conspiracy even though proven to exist as to others.

■ We have little difficulty in concluding that there was ample evidence that Killian and Mathewson were engaged in a conspiracy to violate the statute. Direct, positive evidence of possession and sale was really not seriously disputed as to them. However, the same witnesses whose evidence was sufficient to warrant the conviction of these conspirators testified to facts that demonstrated that the conspiracy for which they were charged terminated before Rowell was identified as having had any contact with the other two. The agents had arrested Killian and Mathewson and had taken possession of the PCP as to which their charge dealt before one of the agents took a telephone call at the Turner residence where the arrest took place. It was this telephone call which for the first time connected Rowell with Jacksonville and with the other defendants. There were several of these telephone calls, at least two of which were received by the Government agent, and the third was received by Turner, an indicted co-conspirator, who testified on behalf of the Government.[2]

BY MR. LEMBCKE:
Q. He was the freakiest individual getting off of the plane.
Q. And so he did identify himself as George?
A. Yes, sir.
Q. And did you introduce yourselves?
A. Yes, sir. I told him my name was Bob, and Agent Driver, Doug, and Sue Ellyn, Sue Attaway. We told him we were friends of Charlie's.
Q. Did you ask him whether he had any drugs on him?
A. Yes, sir.
Q. And what did he say?
A. He stated that he had had fifty hits of PCP, but he had given it to a French chick he had met on the plane, coming down from Detroit.
Q. Did he indicate at that time that he had any other drugs with him?
A. No. He did not."

2. The text of these conversations is substantially as follows:

TESTIMONY OF AGENT DRIVER:
"Q. After the arrest did you have occasion to take a phone call?
A. Yes, I did. As we were in the apartment we had . . . the defendants were all being searched prior to removing them to the Jacksonville Beach jail for processing. The telephone rang and I answered the phone. At that time an individual identified himself as George, and asked for Charlie. I then stated that Charlie was unavailable. I told him that we had had a party that afternoon, and that Charlie was blown out his mind and was unable to come to the phone, he wasn't there right then. The individual then stated that he had to know by 9 o'clock if Charlie wanted him to get on the plane and 'I told him I understood *from Charlie that Charlie was waiting for his arrival, that he was expecting some-*

By the time of the first call the only conspiracy alleged in the indictment was totally terminated, having been finally frustrated by the arrest of the three persons present at the Turner residence and the seizure of the remaining PCP on hand.

Upon his arrival at the Jacksonville airport Rowell was questioned. He assumed the agents questioning him were friends of Killian and Mathewson. We have quoted above the entire conversation as testified to by agent Starratt. This part of the statement attributed to Rowell by Starratt was only a small part of what the Government originally intended to introduce in the case. The trial court ruled out everything else that was said on the ground that, even though it would have been admissible against Rowell, it would have been so prejudicial to the other defendants that under the *Bruton* rule, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1967) an attempt to limit evidence for the jury's concern only to the person whose statement was being quoted would be insufficient to cure the prejudicial effect as to the other defendants. The trial court concluded that the testimony which was admitted either had no tendency to implicate either Killian or Mathewson in the conspiracy charge or, if so, the proof against them was so clear and undisputed and the inferences as to them arising from the Rowell statement were too evanescent to jeopardize their interests.

■ In the first place, we note that nothing Rowell said to the agents after the arrest of Killian and Mathewson would be legally admissible in evidence against them. Since the conspiracy had terminated any testimony of statements of his could not be received as binding on the other defendants under the co-conspirator rule, *Krulewitch v. United States,* 336 U.S. 440, 442–443, 69 S.Ct. 716, 93 L.Ed. 790 (1949). The question is whether the statements attributed to Rowell after the termination of the conspiracy could be validly used against him to show his participation in the already terminated conspiracy. We know of no rule that prohibits such evidence. Rowell freely indicated that he had arrived from Detroit; there was undisputed testimony previously given that the PCP source was in Detroit; that his name

one, but I couldn't say for sure. The individual then told me to have Charlie call him, to get Charlie to call him. I reiterated the fact that Charlie was tied up, he was busy, and that he was unavailable but Charlie was expected.' "

WITNESS PAUL TURNER TESTIFIED:

"Q. Do you recall afterwards receiving a phone call?

A. Yeah.

Q. And would you tell us what happened in that phone call?

A. Well, he says: 'Is this Ricky's house?' I said: 'Yeah, it is.'

Q. Where did he say he was?

A. Michigan.

Q. Did he identify himself on the phone?

A. He said: 'George from Michigan.'

Q. And did you tell him anything?

A. Yeah, I said: 'Well, call this number and Rick will be there.'

(It turns out that the number was the number of agent Starratt whose testimony was as follows:)

A. At approximately 8:10 p.m. on July 22 I received a phone call. The individual on the other line identified himself as George . . . and he wanted to speak to Charles. I told him Charles was unavailable at this time but I was a close friend with Charlie, and Charlie told me to tell him to come on down that night—to come to Jacksonville and George said: 'Well, I don't know if I want to come. I want to talk to Charlie first.'

'I reiterated that he was not available, and if he left the message, I told him I would pick him up at the airport, just give me the flight number and I would be out there.'

Q. Did he, in fact, give you the flight number?

A. He did not at that time. He said: 'Well, I will think about it and call you back in 20 or 30 minutes.'

'At approximately 8:30 p.m. I received another call from George. George said he would be in on the Delta Flight 881 arriving in Jacksonville on the 23rd of July at approximately 1:36 a.m. . . . .'

Q. Now, did he say where he was coming from?

A. Detroit, Michigan."

was George; that he was arranging a meeting with Mathewson and Rick Turner at the very time that the latter two had just been arrested in connection with the seizure of the PCP in Jacksonville; that he started South with a quantity of PCP and clearly indicated that he was expected by some of the other conspirators. While we agree with the trial court that these remarks by Rowell were insufficient, coming after the termination of the conspiracy, to permit the inference that he was a party to the conspiracy so as to be admissible against the others, we have no doubt about their sufficiency to permit the jury to consider them as bearing upon his being a member of the conspiracy. The hearsay statements were admissible against him as an admission against interest, but were not admissible, if objected to by the others, to help the Government make out its case of the conspiracy which had terminated.

Answering the two-part inquiry, then, we hold that there was enough direct evidence of the existence of a conspiracy between Killian and Mathewson to sustain their conviction; and, too, there was enough evidence in light of the testimony concerning Rowell's statement, to tie him into the conspiracy as well.

The contention by Killian and Mathewson that the hearsay statement of Rowell, not admissible as against them, was nevertheless prejudicial to their case can be quickly answered. In the first place, we note that counsel did not request the trial court to give a limiting instruction to the jury—that is to say they did not ask the court to tell the jury that whatever Rowell had to say after his arrival was admissible only as against him and could not be considered on the question of guilt or innocence of the others. No such instruction was requested because, as commented on by the trial court, counsel seemed to consider that it might do them more harm than good.

■ We recognize, of course, that even the giving of a limiting instruction may not be sufficient where a co-defendant's confession in a joint trial so clearly implicates the complaining co-defendant as to make it impossible for the jury to consider it only against the defendant who made it, *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *United States v. Maddox,* 492 F.2d 104 (5 Cir. 1974).

■ The real substance of the matter here is, however, that while Rowell's statement was sufficient to tie him in to the conspiracy already so overwhelmingly proved against Killian and Mathewson, it really had no significant impact as to the existence of that conspiracy. It added nothing to the proof of the actual purchases, and offers for sale by the other conspirators fully testified to by the Government agents. The only point illuminated by Rowell's testimony was that, in addition to the overwhelming proof of guilt of the others, Rowell simply tied himself in as a participant with that guilty conduct. For this reason, Rowell's testimony was hardly relevant, but if relevant at all, it was clearly without prejudicial effect and harmless beyond a reasonable doubt. As will be noted from reviewing the actual words which George Rowell was reported to have said they are sufficient from which the jury could infer that he had participated with the other conspirators to furnish the PCP which the jury found they possessed with the intent to sell and with having conspired to do so. There is not enough to add one feather's weight to the proof that went to the jury as to the existence of the conspiracy, as related to the other two defendants.

Another substantial ground of appeal raised by all of the appellants is that at the time of the Government's opening statement the jury was told that as a part of the Government's case there would be evidence "of a long conversation with George, at which George Rowell stated he was the source for the PCP that Charles was selling here in Jacksonville, Florida, and that he had sold them a great deal. And, of course,

the agents will relate to you exactly what this conversation was all about," whereas, as we have noted above, no such testimony by the agent as to Rowell's having sold the PCP to Mathewson was admitted by the trial court.

■ As we have previously said, this statement by the prosecuting attorney "was improper" and it was a "breach of propriety," *United States v. Stone,* 472 F.2d 909 (5th Cir. 1973). The vice of this argument is that at the time the Government attorney was telling the jury that he would prove that Rowell had made a confession, he knew it would be subject to attack on the ground of its being hearsay as to two of the defendants and on the grounds explained in *Krulewitch, supra,* (the termination of the conspiracy) and *Bruton, supra,* (the overwhelming prejudice it would have as against the remaining defendants, even though admissible as against Rowell himself).

In the *Stone* case, this Court, speaking of such an opening statement said: "We express our disapproval of the practice indulged in by the prosecution. It was improper." In the *Stone* case, defense counsel made a motion for mistrial at the time the statement was made. The trial court carried the motion with the case, with the idea that the motion would be overruled if the confession was actually admitted, as it was in that case. The court then said: "Once the confession was found to be voluntarily made and received in evidence the effect of the prosecutor's breach of propriety was dissipated."

In the case now pending before us, counsel made no motion for a mistrial and made no motion to strike the statement when it was made, waiting until the conclusion of the trial to make a motion for mistrial for the improper statement. We consider this an important factor in determining whether reversible error occurred by reason of this improper opening statement. It is clear beyond doubt that defense counsel were aware at the time that the opening statement was made that they would attack the admissibility of George Rowell's alleged statement implicating himself and his two Jacksonville friends. They did not raise the issue at the time of the opening statement, and, furthermore, when the trial court was required to take out several hours during the trial to consider the proffer by the Government of the agents' statement of Rowell's conversation and when the court clearly showed its dissatisfaction with the fact that the Government had not cleared up this matter prior to trial, counsel still did not make a motion for mistrial, but waited until the Government's case was closed; the court then permitted the case to go on to the jury after the trial court had expurgated most of what Rowell was reported to have stated to the agents.

In light of the circumstances of the case as it developed, it appears that the conviction of Killian and Mathewson was in no way related to the source of their PCP. We conclude, therefore, that the statement in the opening remarks by Government counsel was in no way prejudicial to them. As to Rowell, the trial court, rightly we think, left enough testimony as to his identifying himself with the Jacksonville conspiracy to make it clear that as to him, also, the statement was not prejudicial. Since it was not objected to and since no timely motion for mistrial was made, we conclude that this prosecutorial misconduct did not amount to reversible error.

■ This Court has too frequently been faced with appeals raising the issue of prosecutorial misconduct. More generally, it arises when the Government attorney argues his case to the jury, a situation which sometimes permits zeal to out run discretion. *See Handford v. United States,* 249 F.2d 295 (5 Cir. 1957), and *United States v. Brown,* 451 F.2d 1231 (5 Cir. 1971). In both of these cases, this Court reversed convictions because of improper argument. In other cases, either where no motion has been made or where the overkill contained in the argument, when weighed against the

entire case seems to the satisfaction of this Court not to be prejudicial, we have criticized the conduct but have not reversed. It would appear that the language of this Court in the *Stone* case would have been sufficient warning to Government counsel to take pains to avoid making this precise mistake again. We now add this further authoritative determination that it is improper conduct for a prosecuting officer to state categorically to a jury that one of the defendants has confessed to the crime for which he is on trial unless such confession has already met the test of voluntariness and other questions of admissibility that may lurk in the trial to come. Neither the trial court nor this Court can spare the judicial time necessary to deal further with this problem which we have unmistakably and clearly settled.

We have dealt with the complaint that the court erred in denying the motion of appellant Rowell for a judgment of acquittal based on the lack of evidence to support a conviction. We find no error in submitting his case to the jury.

The appellants attack the action of the trial court in refusing to strike the testimony of Paul Warren Turner, one of the participants in the drug sales who testified on behalf of the Government. The basis for the attack was that he was incompetent because of being a user of some nature of drugs. It is contended that he was too incoherent for his testimony to be worthy of submission to the jury. While it is true that Paul Turner was a heavy user of drugs and that he suffered from time to time from hallucinations, he testified at the trial that he had not been under the influence of drugs for several days. Moreover, the trial court had an opportunity to examine his testimony in context with the other evidence introduced. We conclude, therefore, that the question of his competence to testify as a witness is one of the matters that must be left to the sound discretion of the trial court unless there can be shown to have been an abuse of discretion, *Shuler v. Wainwright,* 491 F.2d 1213, 1224 (5th Cir. 1974). Here, we find no such abuse of discretion.

The judgments are affirmed.