527 F.2d 401
 UNITED STATES of America, Plaintiff-Appellee,
v.
Hargis Ray MURRAY, Joe Wesley McDonald, Edd C. Douglas,
A/k/a E. C. Douglas, Leon Buhl, Jr., Arthur
Jackson Douglas, and Elbert C. Douglas,
Jr., Defendants-Appellants.
 No. 74--4226.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 18, 1976.
Rehearing and Rehearing En Banc
Denied April 6, 1976.
 
 Kenneth C. Whiteley, Bedford, Tex. (Court appointed), for Murray.
 Richard L. Bourland, Ft. Worth, Tex. (Court appointed), for McDonald.
 L. Clifford Davis, Ft. Worth, Tex., for Edd Douglas and Elbert C. Douglas.
 Jack W. Beech, Ft. Worth, Tex. (Court appointed), for Buhl.
 Craig A. Washington, Houston, Tex., for A. Douglas.
 Frank D. McCown, U.S. Atty., W. E. Smith, John W. Sweeney, Jr., Asst. U.S. Attys., Ft. Worth, Tex., for plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of Texas.
 Before COLEMAN, CLARK and INGRAHAM, Circuit Judges.
 COLEMAN, Circuit Judge.
 
 Nature of the Case
 
 1
 Edd C. Douglas (a/k/a E. C. Douglas), Arthur Jackson Douglas, Elbert C. Douglas, Jr., Leon Buhl, Jr., Joe Wesley McDonald and Hargis Ray Murray all appeal from their convictions for conspiracy. Arthur Jackson Douglas, Buhl and McDonald also appeal from convictions on substantive charges of distributing heroin. The appellants were indicted under a six count indictment filed September 12, 1974. Count 1 of the indictment alleged that from approximately April 1, 1974 until July 30, 1974 Edd C. (a/k/a E. C.) Douglas, Arthur Jackson Douglas, Elbert C. Douglas, Jr., Leon Buhl, Jr., Joe Wesley McDonald, Hargis Ray Murray, Arthur Ray Jones,[1] and Edward Nelson Rockwell[2] did knowingly and intentionally 'combine, conspire, confederate and agree' with each other and with other named and unnamed co-conspirators to commit offenses in violation of 21 U.S.C. § 841(a)(1)[3] to-wit: 'To knowingly and intentionally possess with intent to distribute and to distribute heroin.' Eight overt acts, all of which were meetings between various co-conspirators and undercover agents, were alleged as committed in furtherance of the conspiracy in violation of 21 U.S.C. § 846.[4]
 
 
 2
 In addition to the conspiracy charge contained in Count 1, the indictment contained allegations of distribution of heroin to undercover government agents by four of the appellants. Joe Wesley McDonald was charged with distribution by Count 2; Leon Buhl, Jr., by Count 4; Arthur Jackson Douglas by Count 5; and Edd C. Douglas by Count 6.
 
 
 3
 After the persentation of the government's case, the Court granted appellant E. C. Douglas' motion of acquittal with respect to Count 6 of the indictment. The jury found all appellants guilty as charged on the remaining counts of the indictment.
 
 
 4
 We affirm the convictions of Arthur Jackson Douglas, Buhl and McDonald as to the substantive charges of distributing heroin. We also affirm the convictions of Edd C. Douglas and Joe Wesley McDonald as to the conspiracy count of the indictment. Finding the evidence insufficient to connect Arthur Jackson Douglas, Elbert C. Douglas, Jr., .leon Buhl, Jr., and Hargis Ray Murray to a conspiracy, we reverse their conviction as to the conspiracy charged in Count 1 of the indictment.
 
 
 5
 The appellants assign numerous errors, both collectively and individually. We have thoroughly reviewed the over 2,300 pages of the trial record and find only four aspects of the case that warrant discussion: (1) the sufficiency of the evidence as to the conspiracy charge; (2) whether the trial judge abused his discretion in not allowing appellants to examine Deborah Godwin; (3) whether an erroneous in-court identification of appellant Arthur Jackson Douglas constituted reversible error; and (4) the trial court's evidentiary rulings concerning certain hearsay statements, testimony allegedly contrary to the government's answers to appellant's Bill of Particulars, and testimony concerning the June 14th sale of what turned out to be lactose.
 
 
 6
 Judge Tuttle recently wrote in United States v. Killian, 5 Cir. 1975, 524 F.2d 1268, that whenever the sufficiency of the evidence is challenged in a conspiracy case our inquiry must be twofold:
 
 
 7
 The first question is whether a conspiracy was proven within the intendment of the indictment. If this question is answered in the affirmative, the next question is: 'Against which of the defendants was there adequate proof that he was a party to the conspiracy?' 524 F.2d at 1271.
 
 
 8
 We have little trouble in answering the first question. We find ample evidence that several people conspired to distribute heroin during the named period and also that heroin was sold. It is the second question that is troublesome. Against which of the defendants was there adequate proof that he was a party to the conspiracy? To answer this question we must necessarily state the evidence as to each appellant in some detail.
 
 THE EVIDENCE AS TO E. C. DOUGLAS
 
 9
 The government contends that E. C. Douglas was the central figure in a conspiracy to distribute heroin in the Fort Worth, Texas area. Harold Reed, an individual cooperating with federal Drug Enforcement Administration agents, testified that on the night of April 8, 1974, he was negotiating to buy some heroin from co-defendants Joe McDonald and Arthur Jones. He testified that he requested a sample of the heroin and was told by Joe McDonald that it would take some time because they would have to go see E. C. Douglas.
 
 
 10
 On the evening of May 3, 1974, between 8:00 and 10:00 p.m., federal DEA Agent Charles Mathis and Mr. Reed were at the Sugar Hill Lounge on Evans Street in Fort Worth. They saw E. C. Douglas cross the street and approach his brother, Elbert C. Douglas, Jr., who was standing at the curb. Reed went over to E. C. Douglas and told him that they had been trying to score a half ounce from Junior Buhl, but Buhl had acted like he did not want to sell the dope. Reed then asked E. C. Douglas, 'Can you do it for us?' After chatting awhile E. C. said that he would try to get them an ounce that night. Reed and Mathis stayed around for awhile, but when E. C. Douglas failed to return they left.
 
 
 11
 On June 12, 1974, a cooperating individual, Albert Bovance, saw E. C. Douglas, stopped him and told him that he had someone who wanted to buy an ounce of dope. E. C. said, 'Well, okay, bring them over and Junior (Elbert C. Douglas, Jr.) will take care of business.' The next day Bovance and Mathis went to see Elbert C. Douglas, Jr., and told him they wanted to buy an ounce of dope and that E. C. had sent them. After consulting a friend, Elbert C. Douglas, Jr. said, 'I think I am going to pass and I don't want E. C. fooling with it, neither.' Bovance went to see E. C. Douglas later that day and told him that he had seen Junior but that he didn't want to make any money. E. C. said that he would take care of that and for Bovance to bring Mathis back over the next day.
 
 
 12
 On June 14, 1974, agent Mathis and Albert Bovance had a meeting with E. C. Douglas in the 2100 block of Evans Street in Fort Worth. Bovance introduced Douglas and Mathis, whereupon Douglas asked Mathis, 'What do you want, a piece?'[5] Mathis replied that he did and asked how much it would be. E. C. Douglas said it would be $800.00. E. C. told him, 'Go into the club and sit down and I will send somebody in there.' A short time after Agent Mathis and Bovance entered the club, Hargis Ray Murray came in and asked, 'What are you looking for?' Agent Mathis told him he was trying to score dope, but that he had already made a deal with E. C. and was waiting on that to go down. Murray responded, 'He sent me, that is what I got, he sent me.' Murray told Mathis to wait and left the club. A little later Mathis and Bovance observed E. C. Douglas go to the passenger's side of a pickup truck and open the door. He leaned down and reached either underneath or behind the seat and removed a small package. Bovance testified that Douglas called Hargis Ray Murray over and gave him the package which Murray put in his pocket. E. C. Douglas then got in his truck and left. About an hour later Bovance talked to Murray and Murray said he was going to do business with Bovance and that Mathis could watch the deal going down. Bovance and Murray walked over to a green garbage can and Murray retrieved a package from the can. Murray gave Bovance the package containing a white powder in exchange for $800. Chemical analysis of the powder subsequently showed that it was only lactose and contained no opium derivative.
 
 
 13
 The next day, Bovance saw E. C. Douglas in the 2100 block of Evans Street and complained that what E. C. had sold them was not dope. E. C. asked Bovance what color it was and Bovance replied that it was white. E. C. then said that his dope was brown. Three days later, on June 18, 1974, Mathis and Bovance again saw E. C. Douglas. Mathis protested to E. C. that he had been 'burned'. Mathis testified that Douglas told him, 'Yeah, I heard you got burned, you shouldn't have given him all of your money.' E. C. Douglas then told him to meet him back at the club in 30 minutes, and he would 'make it right'. However, Douglas never came to the club.
 
 
 14
 Agent Mathis had seen Hargis Ray Murray earlier on June 18th and complained to him that he had been 'burned', and demanded his money back. Murray said that he thought the dope was good. He first stated that E. C. Douglas had burned them but then he cnanged his story and said that someone else had stolen the dope and substituted it.
 
 
 15
 Manuel R. Trevino, Jr., who had pleaded guilty in another case and agreed to testify for the government, stated that in late June, 1974, he purchased grams of heroin from Whillie Arthur 'Joe Boy' Douglas, an unindicted co-conspirator. Trevino returned to purchase heroin the next week from 'Joe Boy' but was told to hold on a second because he didn't have any more on him. 'Joe Boy' then went across the street and walked up to E. C. Douglas who was standing there alone. 'Joe Boy' then came back and, according to Trevino, 'he had the gram'. Trevino testified to a similar transaction in early July, 1974, where 'Joe Boy' had no heroin but returned with some after seeing E. C. Douglas. Trevino also testified that he had offered to sell ounces of heroin to E. C. Douglas and had conducted negotiations toward that end but that the sale had never taken place.
 
 
 16
 Albert Bovance testified to another incident involving E. C. Douglas. He testified that in mid-May, 1974, he and his half-brother, Bobby Gene Younger, were traveling along the turnpike in Fort Worth when they passed a car on the side of the road which appeared to have a flat. Bovance and his half-brother pulled over behind the car and got out. Younger gave one of his tires to the man at the car and in return was given the tire that was supposed to have been flat. Younger and Bovance returned to their house and took the rim out of the tire. Inside the rim was a long plastic bag which contained a white powder. Bobby Gene Younger told Bovance that it was dope. E. C. Douglas was now present and Douglas and Bobby Gene Younger divided one half the powder between them. They then unlocked the door and Joe Wesley McDonald and two other people came in and split the other half among themselves. They placed some money on the floor which E. C. Douglas and Bobby Younger picked up.
 
 THE EVIDENCE AS TO JOE WESLEY McDONALD
 
 17
 Government agent Charles Mathis and informant Harold Reed testified that they had gone to a Fort Worth apartment building to buy some drugs from Arthur Ray Jones, a co-conspirator who pleaded guilty prior to trial. While Reed and Mathis were waiting for Jones, appellant Joe Wesley McDonald arrived. McDonald told them to wait a few minutes and Ray would be there. Soon Arthur Ray Jones arrived and Reed, Jones and McDonald walked toward the apartment and discussed buying an ounce of heroin. Reed told McDonald that he was interested in buying an ounce of heroin, and McDonald told him that he would be able to handle the transaction. Reed told McDonald that before he scored or bought any heroin he would have to have a sample. McDonald said he would go get a sample, but it would take some time since he would have to run E. C. Douglas down. Jones and McDonald left and Reed returned to the car to get DEA agents Mathis and Eddie Brown. Reed, Mathis and Brown then went up to the apartment. McDonald and Jones returned to the apartment, and McDonald told Agent Mathis to go to the back with him because he had a sample for him. McDonald laid a piece of paper out that contained a quantity of beigy white powder. He placed some of the powder on a fingernail file and snorted it. He scraped some of the powder off on to another piece of paper and gave the rest to Agent Mathis. Mathis left the apartment and tested the powder to determine if it contained any heroin or opium content and obtained a positive reaction. Reed, Mathis and Brown returned to the apartment after testing the powder, left for a short while and returned again. Ray Jones returned looking for a flashlight. He said the dope was up in the loft and he couldn't see how to get it. Jones returned and sold to Agent Mathis for $800 approximately one ounce of a beige colored powder, thought by Mathis to be heroin. Mathis asked Jones if they could do something else. Jones replied that he mainly dealt in 'weed' (marijuana) and that McDonald's business was heroin. When Mathis asked Jones where McDonald got his heroin, Jones replied, 'I don't know. I guess he went to E. C. Douglas.'
 
 
 18
 Informant Arthur Bovance also linked McDonald with a drug conspiracy by his testimony that McDonald participated in the mid-May transaction with E. C. Douglas involving some heroin obtained from the inside of a tire. The details of this transaction are described in the summary of evidence against E. C. Douglas, supra.
 
 THE EVIDENCE AS TO HARGIS RAY MURRAY
 
 19
 Both parties concede that the only evidence linking appellant Murray to any drug conspiracy is his participation in the June 14th sale from E. C. Douglas to Albert Bovance of what proved to be lactose, a non-narcotic substance. The facts of this transaction are detailed in the summary of evidence as to E. C. Douglas, supra.
 
 
 20
 THE EVIDENCE AS TO LEON BUHL, JR.
 
 
 21
 On the afternoon of May 3, 1974, informant Reed and Agent Mathis went to Evans Street to look for appellant Leon Buhl, Jr. When they located Buhl, Reed told him that they were interested in 'scoring'. Buhl said he had looked for them on April 27, but they had failed to keep an appointment with him. Reed then asked whether Buhl could handle a transaction involving one-half ounce or one ounce of heroin. Buhl said that he thought he could, but that he would need a little time to try to get it together. He stated that all he had at that time were some $25 bags. He made an appointment to meet them between 6:00 and 7:00 that evening on Evans Street. When Mathis and Reed arrived for the appointment, Buhl was not on the street. Reed decided to go into the 2117 Club on Evans Street. Upon entering the Club, Reed saw Buhl sitting with E. C. Douglas; E. C.'s brother, Arthur Jackson Douglas; Edward Nelson Rockwell and several other people. Reed asked Buhl whether he had taken care of the matter they had discussed earlier. Buhl replied that all he had heard was talk and if Reed really wanted to score, he wanted to see the money. Reed then returned to the car and spoke with Agent Mathis. He obtained $450 in government funds from Mathis and returned to the 2117 Club. Reed went over to the table where Buhl was sitting, told him he had the money and asked whether Buhl had the drugs. Buhl replied that he didn't, but still insisted on seeing the money, whereupon Reed flashed the money to Buhl. Buhl then told Reed that he needed a little time and to meet him at about 8:00 in the same area. Reed then returned to the car and handed the $450 back to Agent Mathis.
 
 
 22
 At approximately 8:00 p.m. that evening, Reed and Mathis returned to Evans Street and met Buhl at Tommy Bradden's Club. When Reed and Mathis entered the Club, Buhl was shooting pool with Edward Rockwell. Reed started talking with Buhl and, according to the testimony of Agent Mathis, asked Buhl, 'Junior, where is the heroin?' Buhl replied that he had not been able to make a connection for any good brown dope. He said, however, that he had a sample which they could buy if they wanted it. Agent Mathis responded that they wanted one-half ounce. Buhl told him that it would take a little while, but he might be able to obtain that amount later that afternoon or the next day. Mathis protested that he was used to getting free samples but then agreed to pay the $25. Buhl told Mathis and Reed to go and wait in the men's room, which they did. Shortly thereafter, Rockwell came into the men's room and, according to Mathis, stated, 'Junior sent this.' Rockwell handed Reed a small piece of paper, and requested the $25. Reed gave the paper to Mathis, and Mathis gave Reed $25 in government funds. Reed gave the money to Rockwell, and Rockwell left the men's room. Agent Mathis put the sample in his right pocket and, along with Reed, returned to the pool table. Mathis then asked Buhl, 'Junior, is this going to be the same dope as I am going to get later?'; to which Buhl replied, 'This will be the same or better.'
 
 THE EVIDENCE AS TO ARTHUR JACKSON DOUGLAS
 
 23
 On May 24, 1974, Albert Bovance went to the Green Door Lounge in Fort Worth. Bovance was accompanied by Fort Worth police trainee, E. B. Neil, Acting in an undercover capacity, and followed by Fort Worth police narcotics Officer B. R. Armond who was there for surveillance purposes. Bovance and Neil entered the lounge, and Bovance went over and started talking with Arthur Jackson Douglas. Bovance stated that he had someone who wanted to buy some dope. Bovance testified that Douglas walked down to officer Neil and asked if he wanted 'to get high'. Neil asked why, and Arthur Jackson Douglas replied that he had some 'good stuff to take care of the job'. Neil asked what the price was, and Douglas told him it would be $25 each. Douglas then sold Neil two balloons, one pink and one red. Subsequent chemical analysis showed both balloons contained heroin. When asked by Neil if the stuff was good, Arthur Jackson Douglas replied that it was and that Neil should return when he needed more and ask for 'Arthur'. Neil and Bovance then left the lounge and turned over the balloons to Officer Armond. Shortly thereafter, Officer Armond testified that he saw Arthur Jackson Douglas leave the lounge. Officer Neil, when asked to identify Arthur Jackson Douglas in court, identified the wrong man; however, Albert Bovance did make a correct in-court identification of Douglas, and testified that Douglas was the person who sold Neil the drugs.
 
 
 24
 The only other evidence involving Arthur Jackson Douglas was his presence at the table with Leon Buhl, E. C. Douglas and others on May 3, 1974, when Harold Reed discussed the sale of some heroin with Buhl.
 
 
 25
 THE EVIDENCE AS TO ELBERT C. DOUGLAS, JR.
 
 
 26
 The evidence against Elbert C. Douglas, Jr., consisted of the following occurrence. On June 12, 1974, Albert Bovance met with E. C. Douglas and informed him that he had someone who wanted to buy some dope. E. C. told Bovance to bring them over and that 'Junior', meaning Elbert C. Douglas, Jr., would 'take care of business'. Bovance and DEA agent Mathis went over the next day to see Elbert Douglas, Jr., and told him that they wanted to buy some dope and that E. C. had sent them. Elbert Douglas, Jr. Consulted with a friend who told Douglas, according to agent Mathis' testimony, that he didn't think Mathis was 'cool' and that he thought he might be the 'man', meaning he might be a police officer. Elbert C. Douglas, Jr., then said, 'I think I am going to pass and I don't want E. C. fooling with it, neither.' Mathis told Elbert Douglas, 'Okay, well, maybe later' and then he and Bovance walked out. Bovance went to see E. C. Douglas later that day and complained to him that Junior didn't want to make any money. E. C. Douglas then told Bovance that he would 'take care of that'.
 
 SUFFICIENCY OF THE EVIDENCE AS TO CONSPIRACY
 
 27
 Viewing the testimony in the light most favorable to the government, Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, we have little trouble finding the existence of a conspiracy to distribute heroin and finding that E. C. Douglas and McDonald were involved in that conspiracy. We have no doubt that a reasonably minded jury could find the evidence 'inconsistent with every hypothesis of innocence', United States v. Moore, 5 Cir. 1974, 505 F.2d 620, 623, cert. denied, 1975, 421 U.S. 918, 95 S.Ct. 1581, 43 L.Ed.2d 785. All appellants assign as error the trial court's denial of their motions for directed verdict. In this Circuit the standard for appellate review of conspiracy cases is whether slight evidence connected a particular defendant with the alleged conspiracy, once the existence of an agreement or common scheme of conspiracy is shown, United States v. Reynolds, 5 Cir. 1975, 511 F.2d 603, 607; United States v. Sanchez, 5 Cir. 1975, 508 F.2d 388, 392; United States v. Warner, 5 Cir. 1971, 441 F.2d 821, 830, cert. denied, 1972, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58. It is, of course, error for the trial court to charge the jury in terms of 'slight evidence', United States v. Hall, 5 Cir. 1976, 525 F.2d 1254; United States v. Marionneaux, 5 Cir. 1975, 514 F.2d 1244, 1249; United States v. Brasseaux, 5 Cir. 1975, 509 F.2d 157, 161. After a thorough review of the record, it is our view that not even slight evidence connected appellants Elbert C. Douglas, Jr., Arthur Jackson Douglas, Leon Buhl, Jr., and Hargis Ray Murray to the conspiracy, although the evidence was quite sufficient to convict both Buhl and Arthur Jackson Douglas of the substantive charge. The only evidence produced to link Buhl and Arthur Jackson Douglas to the conspiracy was their occasional association with Edd C. Douglas. Mere presence or association is not enough, in and of itself, to establish a person's participation in the conspiracy, United States v. Oliva, 5 Cir. 1974, 497 F.2d 130, 134; United States v. Suarez, 5 Cir. 1973, 487 F.2d 236, 239, cert. denied, 1974, 415 U.S. 981, 94 S.Ct. 1572, 39 L.Ed.2d 878; United States v. Martinez, 5 Cir. 1973, 486 F.2d 15, 24; Causey v. United States, 5 Cir. 1965, 352 F.2d 203, 207; Panci v. United States, 5 Cir. 1958, 256 F.2d 308, 312. The only evidence linking Elbert C. Douglas, Jr., to the conspiracy is his statement to agent Mathis and informer Bovance. Responding to their request that he sell them some dope, Douglas stated, 'I think I am going to pass and I don't want E. C. fooling with it, neither.' This statement, equivocal at best, is simply not enough to establish Elbert C. Douglas, Jr., as a member of the conspiracy. The government counsel on oral argument of this case admitted that the evidence against Elbert C. Douglas, Jr., was very slim. We agree. It's just too slim. The only evidence against Murray from which we can infer that he conspired and agreed to distribute heroin is his participation in the surreptitious sale of what turned out to be lactose. The evidence against Murray was wholly insufficient to support his conviction for conspiracy. The evidence showed that Murray carried out the sale of the lactose in a clandestine and suspicious manner and that he indicated that he was selling dope. However, what Murray in fact sold turned out to be lactose and not dope. Therefore his actions and declarations are equally consistent, if not more so, with an intention to sell a counterfeit substance. The evidence further showed that when Murray first saw agent Mathis after the sale he attempted to flee. When agent Mathis complained that he had been burned, Murray stated that he thought the dope was good but then changed his story saying first that E. C. Douglas had burned them and later that someone else had stolen the dope and substituted lactose. These actions, if anything, are the actions of someone involved in a 'rip off' transaction rather than a true conspiracy. See United States v. Oviedo, 5 Cir. 1976 (No. 75--1899, Jan. 12, 1976) 525 F.2d 881.
 
 
 28
 We are of the opinion that there was insufficient evidence to connect Elbert C. Douglas, Jr., Arthur Jackson Douglas, Leon Buhl, Jr., and Hargis Ray Murray to the established conspiracy and therefore their convictions on Count 1 of the
 
 
 29
 indictment must be reversed. Did the Trial Judge Abuse his
 
 
 30
 Discretion In Not Allowing Appellants to Examine
 
 
 31
 Deborah Godwin?
 
 
 32
 Appellants Buhl, Arthur Jackson Douglas and Murray claim that they were denied their Sixth Amendment right to confrontation by the trial court's refusal to allow them to examine Deborah Godwin in an effort to impeach the testimony of government witness Harold Reed. Counsel for appellant Buhl learned of the existence of one Deborah Godwin after all other parties had rested and at that time informed the Court that there was another witness he would 'like to bring before the Court'. He had information that Ms. Godwin was living with witness Harold Reed and desired to examine her in an effort to impeach Reed's testimony. Appellant Buhl's attorney then suggested that perhaps an in camera examination by the Court would solve the problem since all that he desired were the facts. The Court at first overruled the motion but then took the request under advisement and agreed to check into the matter. After a recess, the Court informed the appellants that he had contacted the woman living with Harold Reed and told them of all the information he had learned. After hearing all the information developed by the Court's in camera examination, Buhl's attorney admitted that the only information beneficial to the defendants was that Ms. Godwin was not Reed's wife and that Reed had represented that he was currently living with his wife. Nevertheless, Buhl moved to have the government produce Ms. Godwin and the Court overruled the motion. This is now assigned as error.
 
 
 33
 While the production of Ms. Goodwin would have obviated any claim by appellants that they were denied their right to confrontation, we do not believe that any prejudice resulted from the Court's denial of the motion. No subpoena was ever filed by any defendant for the witness, and we do not believe that the trial court abused its discretion in denying this motion. If this was
 
 
 34
 error, it was surely harmless. Did an Erroneous In-Court
 
 
 35
 Identification of Appellant Arthur Jackson Douglas
 
 
 36
 Mandate a Directed Verdict of Acquittal?
 
 
 37
 Arthur Jackson Douglas claims that his case should have never been allowed to go to the jury because conflicting identifications by witnesses must necessarily have given the jury a reasonable doubt as to his guilt. Police trainee E. B. Neil, who actually paid for the contraband, but who had never seen Arthur Jackson Douglas before, testified that he bought the heroin from Arthur Jackson Douglas. However, when asked to identify Arthur Jackson Douglas in court, Neil erroneously identified Elbert C. Douglas, Jr., as being Arthur Jackson Douglas. Albert Bovance who witnessed the sale and knew Arthur Jackson Douglas personally correctly identified Arthur Jackson Douglas as the person making the sale. Bovance was present during the entire transaction and had, in fact, initiated the sale. Arthur Jackson Douglas was placed at the scene of the crime at the time the sale was consummated by yet another witness, Officer Armond.
 
 
 38
 Douglas' reliance on our decisions in United States v. Johnson, 5 Cir. 1970, 427 F.2d 957, and United States v. Musquiz, 5 Cir. 1971, 445 F.2d 963 Is misplaced. In Johnson, supra at 961 we held:
 
 
 39
 Questions of identification are, of course, ordinarily for the determination of the jury. If, however, as in this case, the sole witness is unsure and there are no other connecting or corroborating facts or circumstances the jury is left without evidence upon which to translate unrelieved uncertainty into belief from the evidence beyond a reasonable doubt.
 
 
 40
 In Musquiz where one witness could not identify the defendant and the other witness was ambivalent on identification, we found insufficient evidence upon which to base a finding of guilt beyond a reasonable doubt.
 
 
 41
 Those cases were good law then and are good law now; they just are not applicable to the facts of the instance case. In the case at bar, we had one positive identification of the appellant and corroborating evidence which placed him at the scene at the proper time. The jury is free to believe the testimony of one witness and reject the testimony of another, United States v. DeRose Industries, Inc., 5 Cir. 1975, 519 F.2d 1066, 1067. It is not the appellate function to judge the credibility of witnesses. The jury had testimony from which they easily could have concluded that Arthur Jackson Douglas was in fact the person who sold the contraband to the undercover officer. The wrongful identification, if anything, inured to the benefit of the appellant; thus, for the reasons stated, we find no merit to this contention.
 
 The Trial Court's Evidentiary Rulings
 
 42
 Appellants assign as error several hearsay statements which they allege were improperly admitted. We stated in United States v. Perez, 5 Cir. 1973, 489 F.2d 51, 61 n. 16:[6]
 
 
 43
 The general rule with regard to the admission of hearsay evidence as to the statements of a co-conspirator may be stated--any act or declaration by one co-conspirator committed in furtherance of the conspiracy and during its pendency, is admissible against each co-conspirator provided that a foundation for its admission is laid by independent proof of the conspiracy.
 
 
 44
 We have reviewed these statements which the appellants claim were erroneously admitted and find that they were properly admitted under the co-conspirators exception of the hearsay rule and do not constitute error.
 
 
 45
 Appellants McDonald and E. C. Douglas argue that the trial court erred in admitting testimony of Albert Bovance concerning the drug transaction in mid-May where heroin obtained from a tire rim was distributed by E. C. Douglas to McDonald and others. They object because the alleged transaction was not mentioned or described in the government's answer to the bill of particulars of appellant E. C. Douglas. The appellant Douglas filed for a bill of particulars seeking inter alia information on all evidence of overt acts the government would offer evidence to support. The government's answer did not mention the transaction in question.
 
 
 46
 The short answer to this contention is that there is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge, United States v. Carroll, 2 Cir. 1975, 510 F.2d 507, 509; cf. United States v. Quesada, 5 Cir. 1975, 512 F.2d 1043, 1046; United States v. Perez, 5 Cir. 1973, 489 F.2d 51, 70, cert. den., 1974, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664.
 
 
 47
 In the case at bar, the prosecutor informed the Court that the government would not object if the defendants wished to recess to further prepare. The defendants chose, however, to proceed forthwith with the cross-examination. We adopt the statement of the Court in United States v. Perez,supra, 489 F.2d at 70--71, where it stated:
 
 
 48
 (W)e find unconvincing appellant's argument that they were surprised by the government's proof adduced at trial of additional accidents not stated in the indictment. While a bill of particulars has for its purpose informing a defendant of the nature of the charges against him so that he will have sufficient detail to prepare for this defense, to avoid or minimize the danger of surprise at trial, and to enable him to plead double jeopardy in the event of a subsequent prosecution for the same offense, . . . it may not be used to obtained a detailed disclosure of the government's evidence prior to trial.
 
 
 49
 Finally, appellants Murray and E. C. Douglas object to the admission of the testimony as to the events surrounding the June 14 sale of the substance that turned out to be lactose rather than heroin. Appellants argue that the indictment charged a conspiracy to distribute a Schedule I narcotic drug to-wit, heroin, and at most the proof shows a conspiracy to distribute a counterfeit substance. They contend this constitutes a fatal variance between the indictment and the proof.
 
 
 50
 This argument fails to distinguish a charge of conspiracy from a substantive charge. The important element of a conspiracy charge is the agreement. If Murray and E. C. Douglas conspired and agreed to distribute heroin, it matters not that later what the government agents actually received was a non-narcotic substance. See United States v. Pennett, 10 Cir. 1974, 496 F.2d 293 (upholding conviction for conspiring to distribute cocaine even though the substance sold turned out not to be cocaine); United States v. Cardi, 7 Cir. 1973, 478 F.2d 1362, 1368--69, cert. denied, 1974, 414 U.S. 1001, 94 S.Ct. 355, 38 L.Ed.2d 101 (evidence sufficient for conviction of conspiracy to sell narcotics where government agents testified to conversation where defendant was told how other defendant had 'burned' them with flour instead of heroin, in response to which defendant stated inter alia, 'I will check into it and do whatever can be done. You'll get it.'); Craven v. United States, 1 Cir. 1927, 22 F.2d 605, 609, cert. denied, 1928, 276 U.S. 627, 48 S.Ct. 321, 72 L.Ed. 739 (court finding that 'a conspiracy to smuggle foreign liquor would be made out, even if . . . in effecting the conspiracy the conspirators had been imposed upon by the substitution of liquor of domestic origin').
 
 
 51
 We therefore hold that the admission of the testimony concerning the lactose transaction did not constitute a fatal variance between the indictment and the proof. As previously stated, however, we find that the testimony was insufficient to establish that Murray conspired and agreed to deliver heroin. We find it unnecessary to determine whether the evidence concerning E. C. Douglas' participation in the lactose transaction was sufficient to connect him with a conspiracy in view of the heavy additional proof that he was intricately involved in other illegal drug transactions.
 
 
 52
 In summary, as to the substantive charges of distributing heroin against appellants Arthur Jackson Douglas, Leon Buhl, Jr., and Joe Wesley McDonald, we affirm. As to the convictions of conspiracy of Edd C. Douglas and McDonald, we also affirm. Finding insufficient evidence to convict appellants Arthur Jackson Douglas, Elbert C. Douglas, Jr., Leon Buhl, Jr., and Hargis Ray Murray of conspiracy, we reverse as to that charge.
 
 
 
 [1]
 Arthur Ray Jones pleaded guilty to Count 3 of the indictment and was sentenced to seven years in prison to be followed by a three year term of special parole. Counts 1 and 2 of the indictment were then dismissed as to Jones. Tr. VIII at 218--20
 
 
 [2]
 Edward Nelson Rockwell pleaded guilty to Count 4 of the indictment and was sentenced to six years imprisonment to be followed by a special parole term of three years. Count 1 of the indictment was then dismissed as to Rockwell. Tr. VIII, 215--16
 
 
 [3]
 21 U.S.C. § 841(a)(1) reads:
 (a) Unlawful acts.
 Except as authorized by this sub-chapter, it shall be unlawful for any person knowingly or intentionally--
 (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substence.
 
 
 [4]
 21 U.S.C. § 846:
 Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
 
 
 [5]
 A 'piece' in street vernacular means one ounce of heroin
 
 
 [6]
 See also Krulewitch v. United States, 1949, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790; United States v. Urdiales, 5 Cir. 1975, 523 F.2d 1245, 1247; United States v. James, 5 Cir. 1975, 510 F.2d 546, 549--50; United States v. Gomez-Rojas, 5 Cir. 1975, 507 F.2d 1213, 1223; United States v. Apollo, 5 Cir. 1973, 476 F.2d 156