578 F.2d 1227
 UNITED STATES of America, Appellee,
v.
Leonard SMITH, Appellant.
UNITED STATES of America, Appellee,
v.
Myron JACKSON, a/k/a Hamp, Appellant.
UNITED STATES of America, Appellee,
v.
Russell SPEARMAN, Appellant.
UNITED STATES of America, Appellee,
v.
Faustino SELVERA, a/k/a "Mexican Frank," Appellant.
 Nos. 77-1510, 77-1514, 77-1515 and 77-1524.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 10, 1977.
Decided May 17, 1978.
Rehearing and Rehearing En Banc Denied June 7, 1978.
 
 J. Joseph McQuillan, Omaha, Neb., for Leonard Smith and Faustino Selvera; Anthony S. Troia, Omaha, Neb., on brief for Leonard Smith, Russell Spearman and Myron Jackson. McQuillan on brief for Faustino Selvera.
 Thomas D. Thalken, Asst. U. S. Atty., Omaha, Neb., for appellee; Daniel E. Wherry (former U. S. Atty.), Omaha, Neb., on brief.
 Before LAY, HEANEY and ROSS, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 Leonard Smith, Myron Jackson, Russell Spearman and Faustino Selvera were convicted on one count of conspiracy to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846. Smith and Jackson were given seven-year sentences. Spearman and Selvera were given eight-year sentences. Each of the appellants was also given a special three-year parole term. The most important issue raised on appeal by each of the appellants is that the trial judge erred in overruling their motion to suppress tape recordings of statements made by and among the appellants after the arrest of Ike Conway the time when they contend the conspiracy ceased. They also contend that the trial court erred in permitting certain police officers to testify in rebuttal. All of the appellants, except Selvera, further contend that the trial court erred in denying the motion for severance after Selvera disrupted the trial in the presence of the jury. For the reasons discussed below, we affirm the convictions of Jackson, Spearman and Selvera. We reverse the conviction of Smith.
 
 FACTUAL BACKGROUND
 
 2
 The trial lasted two weeks. The list of unindicted coconspirators disclosed by the government reveals that the conspiracy purportedly involved over fifty individuals. The chief government witness at trial was Conway, who had served as an informant in the investigation of the conspiracy after he was arrested in September, 1976. Conway was on the witness stand for two full days and testified extensively as to the nature of the conspiracy and his involvement in it. He testified that during the winter of 1974-1975, he was approached by Jackson and Spearman and became involved with them in buying heroin in Las Vegas, Nevada, and then bringing it to Omaha, Nebraska, for distribution. Conway further testified that while at first he did not know the nature of the "business deals," he later became increasingly involved in the heroin traffic and soon began to handle most of the transactions. According to Conway, Selvera did not become involved until March, 1975, when he approached Conway and wanted to join in the heroin deals. Jackson, Spearman and Selvera were all longtime friends of Conway.
 
 
 3
 Conway recounted a trip he and Selvera made to Mexico in an unsuccessful attempt to obtain a cheaper source of heroin. During the trip, Conway made a number of collect calls to his home, including one from Selvera's hometown in Texas.[1] They continued on to California where Conway eventually obtained an ounce of heroin through his brother and paid for it with money supplied by Selvera. They then drove back to Omaha with the narcotics.
 
 
 4
 According to Conway, attempts continued to locate a better source of heroin. He recounted another trip to California; this time, he went with Jackson, Spearman and another friend. Spearman obtained two ounces of heroin with money provided by Jackson. Conway flew back and the others drove back with the heroin. About a month later, Conway again went to California. On this trip, he was able to locate a permanent source for heroin. From that time on, Conway testified that he, or a courier, would fly to California once or twice a month to obtain heroin. He further testified that the money to purchase heroin came from Selvera, Jackson and Spearman. Selvera expected to receive cash in return and Jackson and Spearman expected to receive uncut heroin.
 
 
 5
 In August, 1975, Conway was arrested after a high speed motorcycle chase. The arresting officer was the appellant, Smith, who had been a member of the Omaha Police Department for fourteen years. Smith was the only black officer in the Vice and Narcotics Section and he was expected by the police to have the best access to information about activities in Omaha's north side. Conway and Smith gave conflicting testimony as to the arrest.[2] Smith testified that he arrested Conway pursuant to reports from informants that Conway would be carrying heroin on his motorcycle that day. He further testified that at the scene of the arrest, he found a package of pills which were later analyzed and found not to contain a controlled substance, and that the charges were then dropped.
 
 
 6
 Conway, on the other hand, testified that he was carrying heroin but he was able to "ditch" it before he was taken into custody. Conway was injured as a result of the chase and was taken to a hospital for treatment. At the hospital, he was told he was under arrest for possession of pills. Conway testified that he then called Selvera and told him that he had been arrested by Smith, and that the pills had been planted on him. He further testified that when the charges were dropped, Selvera told him that Smith wanted $2,000 for doing so. Conway gave the money to Selvera to give to Smith.
 
 
 7
 It is from the time of this incident that Smith is alleged to have given police information and protection for Conway to deal heroin in return for payments of $250 a week. Conway testified that he regularly gave the money to Selvera who he believed was delivering the money to Smith. However, Conway testified he never actually saw any money change hands between Smith and Selvera although he saw Smith and Selvera together on five or six occasions. Conway received information about police activities from Selvera. Smith denied ever receiving any payments.
 
 
 8
 In March, 1976, a joint task force of local, state and federal officers began pooling information with respect to the alleged conspiracy. One of Conway's couriers was arrested shortly after her return from California in early March. Smith participated in the arrest. Conway testified that Selvera had warned him that the police knew of the courier's plans. The courier testified that she accordingly took an alternate route back to Omaha. Later in March, Conway's daughter was arrested and subsequently began to cooperate with the investigation. She was arrested by Smith and testified that he told her not to talk and to request an attorney. Smith denied doing so.
 
 
 9
 In September, 1976, Conway was arrested again by Smith. This time, the arrest was made pursuant to an indictment for conspiracy to distribute heroin handed down by the federal Grand Jury for the District of Nebraska. Conway was unable to make bond and he testified that he contacted Selvera who refused to help. At that time, Conway owed Selvera about $4,000. Conway then began to cooperate with the investigation of the conspiracy.
 
 
 10
 Conway was equipped with a body transmitter and various conversations he had with members of the alleged conspiracy, at the instigation of the police, were taped. In early December, 1976, a wiretap was placed on Selvera's phone. Tapes obtained via the body transmitter and the wiretap were admitted into evidence at trial,[3] over defense objections on the grounds of relevancy, materiality and hearsay. The trial court gave a lengthy cautionary instruction.
 
 
 11
 One of the tapes admitted was of a conversation in late October between Conway and Jackson where reference was made to past heroin deals. It also contained a reference to the effect that both of them had been relying upon Smith for protection. Most of the conversations that were admitted were between Conway and Selvera. Some of the conversations contained references to payments to Smith and to information received from Smith. Tapes where Conway contacted Smith and attempted to set up meetings were also admitted. One tape was admitted of a conversation between Selvera and "Eddie," where references are made to Conway's activities.[4] Tapes were also admitted of phone conversations between Selvera and Smith. One of the conversations occurred shortly after Smith had been told by a Drug Enforcement Administration agent that Selvera was being placed under surveillance because of a possible fencing operation with a narcotics connection. The agent indicated that they were close to a search warrant. This was not true at that time, but the statement was made in an attempt to "plant a story" with Smith. In the subsequent call to Selvera, Smith told Selvera he was under surveillance and that Selvera shouldn't do any more "business" there. The conversation occurred on December 14.[5]
 
 
 12
 On December 16, Smith, Jackson, Spearman and Selvera were indicted for conspiring to distribute heroin by the federal Grand Jury for the District of Nebraska. Selvera was arrested on the next day and his house was searched. Among the items found and accepted into evidence were a plastic spoon with a trace of heroin, a plastic bowl and about fifty small squares of aluminum foil. Conway had described using similar implements to cut and package heroin. The police also found a slip of paper in Selvera's wallet which had Smith's address written on it.
 
 
 13
 The case finally came to trial before a jury on April 12, 1977. During the opening remarks of the United States Attorney, Selvera interrupted on three or four occasions and said it was "a God-damned lie." The trial court cautioned Selvera and his counsel. The next day, Selvera interrupted the trial again when Conway began to testify. He accused Conway of lying and called the proceeding a "kangaroo court." The trial court again cautioned Selvera who was then escorted out of the courtroom by a United States Marshal. Selvera returned to the courtroom later in the day. Selvera's counsel stated to the jury that he hoped that the unfortunate remarks made by Selvera would not prejudice them. The trial court instructed the jury that Selvera's outbursts had nothing to do with the other defendants and should not be considered in rendering the verdict. Smith, Jackson and Spearman moved to sever and that a mistrial be granted because of the prejudicial impact of Selvera's outbursts. The motion was denied.
 
 ADMISSION OF THE TAPE RECORDINGS
 
 14
 Each appellant contends that the admission of tape recordings of statements, made by and among the appellants after the arrest of Conway, was prejudicial. They argue that the arrest of Conway effectively precluded the remainder of the coconspirators from continuing with the conspiracy. They contend that the statements were not made during the course and in furtherance of the conspiracy and, thus, are not admissible under the exception to the hearsay rule for statements made by coconspirators, now codified in Fed.R.Evid. 801(d)(2)(E).[6]
 
 
 15
 In this case, prior to the admission of the tapes of the coconspirators' statements, the trial court gave a lengthy cautionary instruction. The trial court cautioned the jury not to consider the tapes unless it was satisfied beyond a reasonable doubt that there was independent evidence of the existence of the conspiracy, that the defendant or defendants against whom the statements were used were members of the conspiracy and that the statements were made in furtherance of the conspiracy.[7]
 
 
 16
 The limitation upon the admissibility of statements of coconspirators in Fed.R.Evid. 801(d)(2)(E) to those statements made "during the course and in furtherance of the conspiracy" was intended to continue the prevailing rule,[8] Advisory Committee's Note to Fed.R.Evid. 801, and is consistent with the position of the Supreme Court. Anderson v. United States, supra; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). This Circuit has recently followed the lead of the First Circuit[9] and held that Fed.R.Evid. 104(a)[10] requires that questions of the admissibility of coconspirators' hearsay statements be determined exclusively by the judge and, thus, the jury no longer has a role in weighing the admissibility of such statements.[11] United States v. Macklin, 573 F.2d 1046, 1048 (8th Cir., 1978); United States v. Bell, 573 F.2d 1040, 1043 (8th Cir., 1978); United States v. Petrozziello, 548 F.2d 20, 22 (1st Cir., 1977). We further held that the judge shall admit such statements only if he determines, by a preponderance of the evidence, that the requirements of Fed.R.Evid. 801(d)(2)(E) have been met. United States v. Macklin, supra at 1048; United States v. Bell, supra at 1048; United States v. Petrozziello, supra at 22-23. We also held that the admissibility of such statements depends upon the judge's determination of whether there is sufficient independent evidence to establish the existence of a conspiracy.
 
 
 17
 Now that we have established the appropriate procedure for the implementation of the coconspirator exception, we turn to its application to the facts of this case. We first note that none of the appellants challenged the cautionary instruction given by the trial court which permitted the jury to weigh the admissibility of the tapes of the coconspirators' statements. In the absence of an appellate decision on point, we cannot say that this was plain error. United States v. Mackedon, 562 F.2d 103, 105 (1st Cir. 1977); United States v. Petrozziello, supra at 23. As the First Circuit has held, "(t)he added layer of fact-finding may not be needed, Weinstein's Evidence P 104(05), but it can seldom prejudice a defendant." Id.
 
 
 18
 The appellants did, however, object to the admission of the tapes and, thus, we must examine whether the tapes were properly admitted and, if not, whether there is a reasonable possibility that the admission of the tapes contributed to the convictions. See Schneble v. Florida, 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Like the First Circuit, the Eighth Circuit has held that our decisions with respect to the admissibility of coconspirators' hearsay statements should not be applied retroactively. United States v. Macklin, supra 573 F.2d at 1048; United States v. Bell, supra 573 F.2d at 1044; United States v. Mackedon, supra at 105.
 
 
 19
 We hold that the conspiracy was a continuing one for the reasons expressed by Judge Lay in his concurring opinion. See p. 1237 Infra.[12] We further hold that the tape recorded statements of Conway and Jackson were inadmissible against the other coconspirators because neither Conway nor Jackson were members of the conspiracy at the time the statements were made, United States v. Williams, 548 F.2d 228, 232 (8th Cir. 1977); United States v. Killian, 524 F.2d 1268, 1272 (5th Cir. 1975), Cert. denied, 425 U.S. 935, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976), and because the statements were not the sort of minor hearsay admitted under the evidentiary doctrine of completeness if omission might result in a disjointed and confusing conversation. See United States v. Williams, supra at 232 n.14; 7 Wigmore, Evidence § 2094 (3d ed. 1940). We also note that while the appellants had an opportunity to cross-examine Conway as to the truth of his statements, they were unable to cross-examine Jackson and, thus, were denied their constitutional right of confrontation. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
 
 
 20
 It does not necessarily follow, however, that the error in admission of the tape recordings was one requiring reversal. As the Supreme Court has held:
 
 
 21
 "(a) defendant is entitled to a fair trial but not a perfect one." (Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Quoting Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953).) Thus, unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required. (See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).)
 
 
 22
 Schneble v. Florida, supra, 405 U.S. at 432, 92 S.Ct. at 1060.
 
 
 23
 After carefully reviewing the record, we are convinced that the error in admitting the tapes had, at most, a very slight effect on the jury with respect to Jackson, Spearman and Selvera and, thus, was harmless with respect to their convictions. However, we cannot say with assurance that there is not a reasonable possibility that the tapes contributed to the conviction of Smith and, thus, the error was not harmless with respect to his conviction.
 
 
 24
 The government's case against Jackson, Spearman and Selvera was a strong one. Conway's testimony clearly implicated each of them in the conspiracy and his testimony is at least in part corroborated by phone, car rental and airline company records. Moreover, the evidence against them contained in the tapes is largely cumulative. Conway testified that Jackson and Spearman initially involved him in dealing heroin and he described in detail a makeup session at which both were present when heroin was prepared for street sale. He also told of trips they made to Las Vegas and California to obtain heroin. The tapes added very little to the government's case against Jackson and Spearman. The tape of the conversation with Jackson only served to confirm the existence of past dealings about which Conway had already testified. There was only one other minor mention of Jackson in the other tapes and no other mention of Spearman.
 
 
 25
 The case against Selvera was also strong. Conway testified that Selvera approached him to join in the operation and he described the trip they took to Mexico and California, stopping at the small Texas town Selvera is from, seeking a cheaper source of heroin. He testified that he saw Selvera and Smith together and that he gave money to Selvera to give Smith. He received police information from Selvera. When Selvera was arrested, among the items found were Conway's gun, heroin implements and a slip of paper with Smith's address. Selvera figures more importantly in the tapes than either Jackson or Spearman, thus, it is a closer case whether there is a reasonable possibility that the improperly admitted tapes contributed to his conviction. In light of the substantial evidence against Selvera and in light of its largely cumulative nature, we are convinced that the admission of the tapes was harmless error with respect to Selvera.
 
 
 26
 In contrast, the government's case against Smith was not as strong. Conway was only able to testify that Selvera told him that he made the payments to Smith in return for obtaining police information and protection. While he saw Smith and Selvera together, he never saw any money change hands. Mere presence or association alone is not enough to establish membership in a conspiracy. See United States v. Scholle, 553 F.2d 1109, 1118 (8th Cir. 1977); United States v. Graham, 548 F.2d 1302, 1312 (8th Cir. 1977). The government offered no evidence of unexplained income or that Smith was living in a style beyond that of his salary. On the other hand, the tapes contained statements that were extremely damaging to Smith especially the tape of Jackson's conversation with Conway which revealed that "Smitty" was also Jackson's "man." Moreover, many of Conway's statements in the tapes were unsubstantiated and were made at the suggestion of the police investigators. There is a substantial likelihood that the tapes adversely affected the credibility of Smith's testimony and his arguably plausible explanations for his actions. The tapes also obviously undercut the testimony of Smith's character witnesses. Thus, we conclude that while there may be sufficient evidence in the record to support Smith's conviction and while a new trial may lead to the same result, we must reverse Smith's conviction because we cannot say that there is not a reasonable possibility that the improperly admitted tapes contributed to his conviction.
 
 REBUTTAL TESTIMONY
 
 27
 The other issue raised by each of the appellants is that the trial court erred in permitting certain police officers to testify in rebuttal because of an alleged violation of the sequestration order. We cannot agree that the trial court abused its discretion in permitting the rebuttal testimony.
 
 
 28
 Early in the trial, a sequestration order was granted upon motion of the appellants and witnesses were excluded from the courtroom. The order did not provide that the witnesses could not read or view any of the extensive media coverage of the trial. Nor did the order prohibit witnesses from discussing the trial. The appellants objected to the rebuttal testimony of a deputy police chief because they alleged he had violated the sequestration order. An evidentiary hearing was held out of the presence of the jury to determine if the order had been violated. It was established that a police officer, at the order of the deputy chief, took notes throughout the trial and relayed this information to government witnesses waiting to testify. The trial court found that this did not violate the sequestration order.
 
 
 29
 Questions as to the sequestration of witnesses are within the sound discretion of the trial court, Langel v. United States, 451 F.2d 957, 962 (8th Cir. 1971); DeRosier v. United States, 407 F.2d 959, 961 (8th Cir. 1969), as is the question of whether or not to instruct segregated witnesses concerning communications with other witnesses after they have testified. Langel v. United States, supra at 963. It is also within the discretion of the trial court to determine whether or not a sequestration order has been violated. United States v. Brooks, 303 F.2d 851, 853 (6th Cir.), Cert. denied, 371 U.S. 889, 83 S.Ct. 184, 9 L.Ed.2d 122 (1962). It is clear from the record that the trial court viewed the sequestration order to be limited to the exclusion of witnesses from the courtroom. We note that in requesting the order, the appellants' counsel did not request that any additional conditions be placed on the order. The finding by the trial court that its limited sequestration order had not been violated was not an abuse of discretion and, thus, it did not err in permitting the rebuttal testimony.
 
 
 30
 Moreover, even if there had been a violation of the sequestration order, it is well established that the witness is not necessarily disqualified and that the witness may instead be proceeded against for contempt. Holder v. United States, 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893); United States v. Atkins, 487 F.2d 257, 259 (8th Cir. 1973). While it is within the discretion of the trial court which remedy is appropriate, the witness is usually to be disqualified only under "particular" or "special" circumstances. Holder v. United States, supra; United States v. Atkins, supra; United States v. Killiyan, 456 F.2d 555, 560 (8th Cir. 1972). We cannot agree that special circumstances exist here. Since the trial received extensive publicity, the witnesses would have been able to obtain the same information about the trial from the media coverage.
 
 SEVERANCE
 
 31
 Finally, Jackson, Spearman and Smith contend that the trial court erred in denying their motion for severance under Fed.R.Crim.P. 14[13] after Selvera disrupted the trial in the presence of the jury. We cannot agree that the outbursts were so clearly prejudicial as to require a reversal.
 
 
 32
 A motion for severance under Fed.R.Crim.P. 14 is addressed to the sound discretion of the trial court. United States v. Anthony, 565 F.2d 533, 538 (8th Cir. 1977); United States v. Jackson, 549 F.2d 517, 523 (8th Cir.), Cert. denied, 430 U.S. 985 (1977); Williams v. United States, 416 F.2d 1064, 1070 (8th Cir. 1969). The general rule is that persons charged in a conspiracy should be tried together, especially when proof of the charges is based upon the same evidence and acts. United States v. Jackson, supra at 523; United States v. Kirk, 534 F.2d 1262, 1269 (8th Cir. 1976); United States v. Hutchinson, 488 F.2d 484, 492 (8th Cir. 1973), Cert. denied, 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974). Severance will only be granted upon a showing of real prejudice to an individual defendant, Id., and requires more than merely showing a better chance of acquittal at a separate trial. United States v. Anthony, supra at 538; United States v. Wofford, 562 F.2d 582, 586 (8th Cir. 1977). Thus, a denial of severance is not a ground for reversal unless clear prejudice and an abuse of discretion is shown. United States v. Jackson, supra at 523.
 
 
 33
 In this case, the trial court gave cautionary instructions and promptly removed Selvera after his outburst on the second day of trial.[14] We recognize that Selvera's outbursts "interjected a brief but unfortunate interlude of irrelevance into the trial" but we are convinced that the trial court's prompt action and cautionary instructions served to prevent any prejudicial effect on the other appellants. United States v. Jackson, supra at 527.
 
 
 34
 Accordingly, the convictions of Jackson, Spearman and Selvera are affirmed. The conviction of Smith is reversed. If Smith is retried, the tape recordings of statements he and Selvera made during the course and in furtherance of the conspiracy would be admissible. The statements of Conway and of Jackson would not be admissible except in the instance that the statements made by Conway are the type of minor hearsay admissible under the evidentiary doctrine of completeness.
 
 
 35
 LAY, Circuit Judge, concurring.
 
 
 36
 I concur in the affirmance of the convictions of Spearman, Jackson and Selvera.
 
 
 37
 I also concur in the grant of a new trial for the defendant Leonard Smith. I do so, however, for reasons somewhat different than those of Judge Heaney.
 
 
 38
 Our inquiry is not whether there was sufficient evidence to sustain Smith's conviction. The fundamental issue on appeal is whether a reasonable possibility exists that evidence improperly admitted may have contributed to Smith's conviction. Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under the law and record one must conclude that such a reasonable possibility exists.
 
 
 39
 The trial court allowed all of the taped conversations into evidence on the government's representation that proof would be introduced (1) that the conspiracy still continued despite Conway's arrest and (2) that Jackson, Selvera and Smith were still members of that conspiracy at the time the conversations took place. The taped conversation between Jackson and Conway which occurred on October 31, 1976, after Conway had been arrested, was inadmissible and clearly prejudicial. At the time of the conversation neither Conway nor Jackson were members of the conspiracy. No evidence was introduced to suggest that Jackson was still a member of the conspiracy at the time of his conversation with Conway. In fact, the indictment specifically alleges that both Spearman and Jackson left the conspiracy in March of 1976.[1]
 
 
 40
 The Jackson-Conway tape was the first tape played and it was by far the most damaging of all of the tapes. It contained remarks, highly prejudicial to Smith, contrived by Conway, who was then acting as a pseudo-police agent. Assuming jurors could in some way block Conway's statements from their minds, they were nonetheless led to assume that Jackson's statements were admissible. The taped conversation reveals that Jackson told Conway "Smitty" was his man and that Jackson had formerly made payments to Smith at the rate of $350.00 per week. These comments were not merely cumulative to other testimony; they injected into the record evidence that Smith had received payments from Jackson, as well as from Conway and Selvera. Since Jackson had clearly left the association in March, this narrative was not made in furtherance of any conspiracy and was therefore inadmissible. Cf. United States v. Birnbaum, 337 F.2d 490, 494-95 (2d Cir. 1964). The government erred in representing to the trial court to the contrary and in using the Jackson-Conway tape. Smith was denied his constitutional right to confront and cross-examine Jackson as to the truth of the statements. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). Cf. Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).
 
 
 41
 I agree with the government that the Selvera-Conway, Smith-Conway and Smith-Selvera tapes were made during the course of the conspiracy and in furtherance of it. There was sufficient proof that the conspiracy continued between Selvera and Smith after Conway's arrest. The tapes show that Selvera mentioned, in his words, "an affileration" and his "people," and his remarks indicated that he still employed Smith. Selvera stated as well that Smith would still provide Conway protection for pay once Conway was back in "business." This evidence, I think, indicates that Smith and Selvera were still associated in the conspiracy charged after Conway's arrest.
 
 
 42
 Although the arrest of one coconspirator terminates his membership in the conspiracy, it does not follow that the conspiracy itself is terminated. See United States v. Williams, 548 F.2d 228, 231 (8th Cir. 1977). Where evidence demonstrates that conspirators remain fully capable of carrying out their purpose, notwithstanding the arrest of one of them, it cannot be said that the conspiracy is terminated as a matter of law. Smith's phone calls with Selvera and Conway, when viewed from the government's point of view, constituted admissible evidence that a clandestine cover-up was still going on. Despite the fact that some of the heroin supply may have been dried up with Conway's arrest, Selvera's conversations with Smith create a permissible inference that the conspiracy between the two of them remained alive and that further drug distribution would take place when the opportunity presented itself. The fact that the conspiratorial object was postponed or slowed down does not unequivocally show that the conspiracy was terminated. Smith's and Selvera's conversations demonstrate to the contrary. Cf. United States v. Papia, 560 F.2d 827, 835-36 (7th Cir. 1977). Even if the conspiracy had come to an end, post-conspiratorial acts may be admitted as linking a party to a conspiracy. See Lutwak v. United States, supra 344 U.S. at 617, 73 S.Ct. 481. Smith's taped conversations with Selvera were admissible because they were made during the continuation of the conspiracy and in furtherance of it.
 
 
 43
 Moreover, even assuming the conspiracy had terminated, Smith's statements would still be admissible against him as admissions against his interest. A conspirator's statement made after a conspiracy has always been held admissible against the declarant as an admission against interest. See Lutwak v. United States, supra 344 U.S. at 618, 73 S.Ct. 481; United States v. Killian, 524 F.2d 1268, 1272 (5th Cir. 1975), Cert. denied, 425 U.S. 935, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976). Even if the taped conversations were admissible, I am unable to conclude that introduction of the taped conversations between Selvera and Conway, which contained Conway's contrived, suggestive and prejudicial comments, was harmless error as to Smith.
 
 
 44
 It is undisputed that the substance of Conway's comments was previously contrived by the investigating officers and Conway. Admittedly Conway was no longer part of the conspiracy; his comments were clearly not in furtherance of the conspiracy. If anything they were in furtherance of a police investigation toward the criminal prosecution of the conspirators. Cf. United States v. Williamson, 450 F.2d 585, 591 (5th Cir. 1971), Cert. denied, 405 U.S. 1026, 92 S.Ct. 1297, 31 L.Ed.2d 486 (1972). The hearsay responses of a party who is not a member of a conspiracy are, if minimal, sometimes admissible under the doctrine of verbal completeness to avoid confusing the jury through the introduction of only that portion of a conversation actually uttered by a coconspirator. See United States v. Williams, supra at 232 n. 14. However, Conway's statements in this case were hardly to be considered minimal. Introduction of the taped conversations between Conway and Selvera took over two days at trial, and Conway's suggestive remarks dominated the conversations.
 
 
 45
 It is true that the trial court cautioned the jury to disregard Conway's statements. In view of the prejudicial impact of the scurrilous remarks made by Conway on these tapes applicable here is Mr. Justice Jackson's statement in his concurring opinion in Krulewitch v. United States, 336 U.S. at 453, 69 S.Ct. at 723: "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction."[2]
 
 
 46
 I do not find that the exclusion of Conway's statements on retrial would require the total exclusion of Selvera's statements. As in Bruton v. United States, supra, there are alternative ways by which the government may obtain the benefit of a coconspirator's comments to a police officer without adulteration of the record through the introduction of self-serving investigative remarks. The prejudice lies in the infusion into the record of contrived suggestive, incriminating remarks by an agent of the police. All of Conway's prejudicial remarks are not needed to reveal what Selvera stated. Excising prejudicial remarks from a statement is often done before reading it to a jury in criminal and civil trials. Furthermore, Conway could testify as to what Selvera told him since he would be subject to cross-examination and confrontation as to what the coconspirator may have said. However, in doing so he should not inject his own prejudicial self-serving comments into evidence.
 
 
 47
 Smith's defense was that his contacts with Selvera and Conway were necessary in his role as a police officer in order to obtain information. Smith testified that he fed information to Selvera in order to maintain their confidence and friendship. The government's evidence, of course, contradicted this. It is not for this court, even after a verdict of guilty, to judge the credibility or weight of Smith's defense. The issue is whether there is a reasonable possibility that the improperly admitted evidence contributed to the conviction. See Schneble v. Florida, 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); Chapman v. California, supra ; Saltzburg, The Harm of Harmless Error, 59 Va.L.Rev. 988 (1973).
 
 
 48
 Setting aside the obvious prejudice of Conway's police-contrived statements, the admission of Jackson's taped conversation alone undoubtedly had a prejudicial effect on the jury in rejecting Smith's defense. To reason on this record that the other evidence was sufficient to find Smith guilty requires us to engage in deciding guilt or innocence from conflicting evidence. This is not the task of the appellate court. Only where there exists Overwhelming independent evidence of guilt should an appellate court conclude that error is harmless beyond a reasonable doubt. Cf. Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Schneble v. Florida, supra 405 U.S. at 431, 92 S.Ct. 1056. No overwhelming independent evidence of guilt was presented here. Other than the prejudicial hearsay evidence on the tapes, no direct evidence that anyone paid Smith any money was introduced. Even if we felt that without the prejudicial evidence a jury would in all likelihood have reached the same result we must still reverse. The error relates not only to prejudicial trial evidence but is of constitutional magnitude as well. See Bruton v. United States, supra. When prejudice of this magnitude enters into a trial our task is to determine, with as much objectivity as possible, whether the error was harmless beyond a reasonable doubt. Chapman v. California, supra 386 U.S. at 24, 87 S.Ct. 824.
 
 
 49
 I cannot in good conscience say that such was the case here.
 
 
 50
 ROSS, Circuit Judge, concurring in part and dissenting in part.
 
 
 51
 I also concur in the affirmance of the convictions of Jackson, Spearman and Selvera. However, I would not reverse Leonard Smith's conviction, and I dissent from that portion of the opinion granting Smith a new trial.
 
 
 52
 I agree with Judge Lay that the conspiracy, at least as between Smith and Selvera, continued after Spearman and Jackson left it and after Conway's arrest. Therefore, the statements made by either Selvera or Smith in the furtherance of the conspiracy were admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence.
 
 
 53
 Although Conway's remarks on the tape recordings, after his arrest and decision to aid in the investigation, were inadmissible against any of the remaining coconspirators, I do not agree that those remarks were so prejudicial that they substantially influenced the jury.
 
 
 54
 There was sufficient admissible evidence to support Leonard Smith's conviction. Conway testified directly about statements Selvera made to him concerning Smith. Some of these statements were made while Conway was still a member of the conspiracy. All of them were made during the continuing conspiracy between Smith and Selvera. Under Rule 801(d)(2)(E), this testimony by Conway was not hearsay and it was very incriminating. Conway testified that after his August 1975 arrest by Smith and the dismissal of those charges, Selvera told him, "Leonard Smith took care of it." Conway also testified that he gave Selvera $2000 to give Smith for getting the charges dropped, and he then gave Selvera $250 a week to give Smith so he could "go ahead and deal drugs and have protection on the street."
 
 
 55
 Conway gave other direct, admissible, and incriminating testimony concerning Smith. He stated Selvera told him that on two occasions during the conspiracy Smith gave Selvera "dope he wanted me to sell for him." He testified that on the day before he was arrested in September of 1976 Selvera told him, "Smitty say you got to get out of town, they got an indictment they are going to bring out(.)" He testified that when Smith arrested him, Smith said, "I got to carry you in, won't be anything to it(.)"
 
 
 56
 Even though Conway's tape recorded statements to Smith and Selvera, after the conspiracy terminated as to Conway, were inadmissible, tape recorded statements By either Smith or Selvera, to each other or to Conway, were admissible. Both defendants made statements incriminating Smith. Selvera stated to Conway, "(T)hat little * * * money that we gave Smitty was well spent * * *." In talking about the vice squad Selvera said, "(T)hey got all new help, and they all work for Smitty." In discussing payoffs with Conway, Smith said, "(L) et's set up another meet cause I don't talk, ah, on situations of this nature." And, "Like I said, I'll talk to you later about that part of it."
 
 
 57
 The most devastating evidence against Smith was tape recordings of his telephone calls to Selvera. On December 14, 1976, Smith called Selvera. The relevant portion of that conversation is as follows:
 
 
 58
 SELVERA Hello.
 
 
 59
 SMITH Hey, what's going on?
 
 
 60
 SELVERA Oh man, what's going on, you know where I stand, you ain't called me no more, froze me out, it's OK.
 
 
 61
 SMITH Everythings been quiet.
 
 
 62
 SELVERA It can't be too quiet if you had some rap for me.
 
 
 63
 SMITH Well, that just come up, see when things come up I get in touch with you.
 
 SELVERA (Laughter)
 
 64
 SMITH Right?
 
 
 65
 SELVERA Uh huh (yes).
 
 
 66
 SMITH Well, everythings quiet, then we'll be quiet.
 
 
 67
 SELVERA Right.
 
 
 68
 SMITH But you gonna have to get your man off my back, he's been calling every day wanting to set up a meeting, he done got so bold he calls at the office every day and I told him that whatever until he has to go through at that end out there.
 
 
 69
 SELVERA Hey, I'll take care of that. What about, what about them pieces? You mean I can't stop no more pieces.
 
 
 70
 SMITH Uh naw, they're watching the house.
 
 
 71
 SELVERA Yeah.
 
 
 72
 SMITH I don't know where they got wind of it at but, uh, I found out yesterday, look like, well, in fact, it was about an hour before I saw you, I said, god damned here he is, I'm thinking about him and here he is.
 
 
 73
 SELVERA Yeah.
 
 
 74
 SMITH But anyhow, they been watching your house so just you know, if you do, don't do any, no more business there. Go some place else and do the business.
 
 
 75
 On December 16, 1976, after Smith's superior officer planted the story with Smith that they were going to get a search warrant for "Mexican Frank's" (Selvera's) house, Smith called Selvera and said, "Yeah, the party you were going to have this morning, I won't be able to make it."I acknowledge that, in addition to this evidence, the jury heard tape recorded statements of Jackson and contrived tape recorded statements by Conway that incriminated Smith. I agree that once the jury heard those remarks they probably could not be completely disregarded. However, the district court gave a lengthy cautionary instruction to the jury before any of the tapes were played. He specifically instructed that:
 
 
 76
 the alleged participation of Ike Conway in the alleged conspiracy involving the defendants, and each of them, in the instant case ceased and terminated on the date of Mr. Conway's arrest, which was 16 September, 1976; From and after that date, any statements made by Conway in tapes or otherwise against his alleged coconspirators, that is, the defendants in this case, may not be considered by you as against the defendants or any of them by reason of the fact that so far as Conway alone is concerned, the conspiracy had ended as of 16 September, 1976, when he was arrested. (Emphasis supplied.)
 
 
 77
 The Supreme Court recognizes that "(i)t is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard * * * information." Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968). Although in Bruton the Court found a limiting instruction insufficient to overcome the prejudicial impact of a codefendant's confession, this case is different. The most damaging inadmissible remarks were made by Conway. He was the government's key witness, was readily available for cross-examination, and was extensively cross-examined. Furthermore, Drug Enforcement Administration agent Robert Upchurch testified that he instructed Conway to involve himself in a conversation concerning Smith in each one of the taped conversations. The jury was well aware of Conway's role as a police agent, and the contrived nature of his tape recorded remarks.
 
 
 78
 These facts convince me that there is no reasonable possibility that the evidence improperly admitted may have contributed to Smith's conviction; that the admission of that evidence was harmless error beyond a reasonable doubt with respect to Leonard Smith's conviction; and that Smith's conviction should be affirmed.
 
 
 
 [1]
 Telephone company records of the calls were introduced at trial
 
 
 [2]
 We consider the evidence in the light most favorable to the government. United States v. Wofford, 562 F.2d 582, 585 n.1 (8th Cir. 1977); United States v. Carlson, 547 F.2d 1346, 1351 (8th Cir.), Cert. denied, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977). We take as established all reasonable inferences from the evidence that tends to support the action of the jury. United States v. Overshon, 494 F.2d 894, 896 (8th Cir.), Cert. denied, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974)
 
 
 [3]
 Transcripts of the tapes were distributed to the jury when the tapes were played; but unlike the tapes, the transcripts were not admitted into evidence. The jury was cautioned that the transcripts were not in evidence and that the tapes were decisive of what was said. No objection to the use of the transcripts or to the instruction has been preserved on appeal. This limited use of transcripts is permissible. United States v. Hassell, 547 F.2d 1048, 1055 n.10 (8th Cir.), Cert. denied, 430 U.S. 919, 97 S.Ct. 1338, 51 L.Ed.2d 599 (1977); United States v. McMillan, 508 F.2d 101, 105 (8th Cir. 1974), Cert. denied, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975). Cf. United States v. Miranda, 556 F.2d 877, 879 (8th Cir. 1977)
 
 
 [4]
 No objection was made to this tape by any of the defendants
 
 
 [5]
 The relevant portion of the December 14 conversation between Smith and Selvera is quoted in the opinion filed by Judge Ross, concurring in part and dissenting in part. See p. 1240 Infra
 A majority of this Court holds that this tape-recorded conversation and other taped conversations involving Selvera or Smith are admissible either because the statements were made in furtherance of the conspiracy which had not yet terminated or, alternatively, because the statements were admissions against interest. I disagree. I do not agree that the conspiracy was a continuing one for the reasons expressed in n.12 Infra. Nor do I agree that the statements are admissible as admissions against interest. Under the Federal Rules of Evidence "admissions" are treated separately from "declarations against interest." Fed.R.Evid. 804(b)(3) provides that statements against the interest of the declarant are admissible and not excluded as hearsay, but only if the declarant is unavailable. Fed.R.Evid. 801(d)(2)(A) provides that a statement by a party is an admission and, thus, by definition, is not hearsay. There is no requirement that the admission be against interest. If the statements were to be admitted under either provision, it would have the practical effect of negating the purpose of the requirements of Fed.R.Evid. 801(d)(2)(E) that the statements be made during the course and in furtherance of the conspiracy in a case such as this where the conspiracy has terminated and which involves multiple defendants. Smith's statements would be admissible with a cautionary instruction that his statements can only be used against him; Selvera's statements would be admissible with a cautionary instruction that they can only be used against him; and Jackson's statements would be admissible with a cautionary instruction that they can only be used against him. Like Judge Lay, See p. 1238 Infra, I have serious doubts about the ability of a jury to perform such mental gymnastics.
 
 
 [6]
 Fed.R.Evid. 801(d)(2)(E) provides:
 (d) Statements which are not hearsay. A statement is not hearsay if
 (2) Admission by party-opponent. The statement is offered against a party and is * * * (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.
 We recognize that Fed.R.Evid. 801(d)(2)(E) provides that a statement by the defendant's coconspirator during the course and in furtherance of the conspiracy is not hearsay. The distinction between a statement which is not hearsay and a statement which is an exception to the hearsay rule is semantic and is not determinative of the outcome of this case. United States v. Hassell, supra at 1051-1052 n.3.
 
 
 [7]
 The use of such cautionary instructions is widespread. 1 J. Weinstein & M. Berger, Weinstein's Evidence, P 104(05) at 104-43 n.17 (1976). Cf. Anderson v. United States, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). Prior to the adoption of the Federal Rules of Evidence, both the First and the Fifth Circuit required the trial court to give a cautionary instruction contemporaneously to the introduction of a coconspirator's statements. See, e.g., United States v. Honneus, 508 F.2d 566, 577 (1st Cir. 1974), Cert. denied, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975); United States v. Apollo, 476 F.2d 156, 163 (5th Cir. 1973). The Eighth Circuit has never expressly adopted the mandatory cautionary instruction rule, United States v. Smith, 564 F.2d 244, 248 n.8 (8th Cir. 1977); United States v. Graham, 548 F.2d 1302, 1310 n.4 (8th Cir. 1977), but it has indicated that such instructions may be advisable. Id
 
 
 [8]
 Both Model Code of Evidence Rule 508(b) and Uniform Rule 63(9)(b) only required that the statement be relevant to the conspiracy and be made during its pendency. The draftsmen of the federal rules rejected the Model Code Uniform Rule approach and retained the "in furtherance" requirement. It was adopted by Congress following a strenuous debate. See United States v. Jackson, 549 F.2d 517, 534 (8th Cir.), Cert. denied, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977). Judge Jack B. Weinstein has stated that this "should be viewed as mandating a construction of the 'in furtherance' requirement protective of defendants, particularly since the Advisory Committee was concerned lest relaxation of this standard lead to the admission of less reliable evidence." 4 J. Weinstein & M. Berger, Weinstein's Evidence P 801(d) (2)(E)(01) at 801-147 (1976)
 
 
 [9]
 The rule announced in United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977), has been reaffirmed in subsequent First Circuit cases. See, e.g., United States v. Mackedon, 562 F.2d 103, 105 (1st Cir. 1977); United States v. Kehoe, 562 F.2d 65, 69 (1st Cir. 1977); United States v. Smolar, 557 F.2d 13, 16 n.4 (1st Cir. 1977); United States v. Martorano, 557 F.2d 1, 11 (1st Cir. 1977), Cert. denied, --- U.S. ----, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978)
 
 
 [10]
 Fed.R.Evid. 104(a) provides:
 Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.
 
 
 [11]
 We also note that prior to the enactment of the federal rules, several circuits already followed the practice of committing preliminary questions of admissibility of coconspirators' statements to the judge rather than the jury. See, e.g., United States v. Rosenstein, 474 F.2d 705, 712 (2d Cir. 1973); United States v. Pisciotta, 469 F.2d 329, 332 (10th Cir. 1972); United States v. Bey, 437 F.2d 188, 192 (3d Cir. 1971); Carbo v. United States, 314 F.2d 718, 737 (9th Cir. 1963), Cert. denied, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964)
 
 
 [12]
 I cannot agree that the conspiracy was an ongoing one. It is often difficult to ascertain when a conspiracy began or ended, 4 J. Weinstein, Supra P 801(d)(2)(E)(01) at 801-152, and it is an issue that must be determined on the facts of the individual case. See, e.g., United States v. Thompson, 533 F.2d 1006, 1010 (6th Cir. 1976); United States v. Sarno, 456 F.2d 875, 878 (1st Cir. 1972). The arrest of one coconspirator does not automatically terminate the conspiracy; United States v. Williams, 548 F.2d 228, 231 (8th Cir. 1977); United States v. Burnett, 582 F.2d 436, 438 (8th Cir. 1976), cert. denied, 429 U.S. 844, 97 S.Ct. 122, 50 L.Ed.2d 114 (1976); United States v. Sarno, supra; United States v. DeSapio, 435 F.2d 272 (2d Cir. 1970), Cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971); "(t)he test is not the arrest of some of the conspirators, but whether the remainder of the conspirators were able to continue with the conspiracy." United States v. Burnett, supra at 438
 In this case, Conway obtained the heroin and was in charge of the network of dealers and couriers. Jackson, Spearman and Selvera lacked access to Conway's network of couriers and dealers. After his arrest, Conway ceased to obtain or distribute heroin and the remaining conspirators were unable to continue the conspiracy. The government argues that the conspiracy should be presumed to be continuing as Conway owed money to Selvera at the time of his arrest. While a conspiracy is presumed to continue until all of its criminal objects have been accomplished, including the collection of illicit gain; United States v. James, 161 U.S.App.D.C. 88, 107, 494 F.2d 1007, 1026, Cert. denied, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974); Levie, Hearsay and Conspiracy, 52 Mich.L.Rev. 1159, 1174 (1954); there was no potential for recovery here since Conway's operation had ceased. Moreover, Selvera refused to help Conway when Conway was arrested and Jackson obtained other sources of heroin.
 
 
 [13]
 Fed.R.Crim.P. 14 provides:
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection In camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.
 
 
 [14]
 Thus, this case can be distinguished from Aratari v. Cardwell, 357 F.Supp. 681 (S.D.Ohio 1973), cited by the appellants, where the outbursts were substantially more disruptive and the trial judge did not have the disruptive defendant removed. We note, moreover, that even more disruptive outbursts than those which occurred here have not been found to warrant a new trial when the trial court took adequate corrective measures. See United States v. Marshall, 458 F.2d 446 (2d Cir. 1972); United States v. Bamberger, 456 F.2d 1119 (3rd Cir.), Cert. denied, 406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668 (1972); United States v. Bentvena, 319 F.2d 916 (2d Cir. 1963)
 
 
 [1]
 The indictment recites as a part of the conspiracy:
 After Ike Conway had delivered the heroin to his dealers and received the money from the sales, Ike Conway would pay SELVERA his share of the proceeds. This arrangement continued on an average of twice monthly until March of 1976 when JACKSON and SPEARMAN no longer actively participated in the operation. Ike Conway's and SELVERA's financial arrangement continued until the return of this Indictment, although the last quantity of heroin brought back by Ike Conway utilizing SELVERA's funds was on or about August 18, 1976.
 
 
 [2]
 This comment was cited by the Court in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Relevant here is the Court's footnote eight, which I set forth in full:
 Judge Hand addressed the subject several times. The limiting instruction, he said, is a "recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else," Nash v. United States, 54 F.2d 1006, 1007 (2 Cir.); "Nobody can indeed fail to doubt whether the caution is effective, or whether usually the practical result is not to let in hearsay," United States v. Gottfried, 165 F.2d 360, 367 (2 Cir.); "it is indeed very hard to believe that a jury will, or for that matter can, in practice observe the admonition," United States v. Delli Paoli, 229 F.2d 319, 321 (2 Cir.). Judge Hand referred to the instruction as a "placebo," medically defined as "a medicinal lie." Judge Jerome Frank suggested that its legal equivalent "is a kind of 'judicial lie': It undermines a moral relationship between the courts, the jurors, and the public; like any other judicial deception, it damages the decent judicial administration of justice." United States v. Grunewald, 233 F.2d 556, 574 (2 Cir.). See also 8 Wigmore, Supra, n. 3, § 2272, at 416.
 Compare E. Morgan, Some Problems of Proof Under the Anglo-American System of Litigation 105 (1956), who suggests that the use of limiting instructions fosters an inconsistent attitude toward juries by "treating them at times as a group of low-grade morons and at other times as men endowed with a superhuman ability to control their emotions and intellects." See also Shepard v. United States, 290 U.S. 96, 104, 54 S.Ct. 22, 78 L.Ed. 196; Meltzer, Involuntary Confessions: The Allocation of Responsibility Between Judge and Jury, 21 U.Chi.L.Rev. 317, 326 (1954).
 Id. at 132 n. 8, 88 S.Ct. at 1626.